## Case No. 2,769.

### The CITY OF TROY.

[9 Ben. 466.] [1]

District Court, E. D. New York. April, 1878.

COLLISION IN NORTH RIVER—TUG AND TOW—LIGHTS.

1. Where a tug coming up the North river with a barge in tow encountered below West Point a passenger steamer coming down, and a collision ensued between the steamboat and the barge; *Held*, that the failure of the tug to display the lights required by law as indicating that she had a tow was not a fault conducing to the collision, it appearing from the evidence that there was no darkness sufficient to prevent an approaching vessel from seeing the vessel in tow of the tug.

2. Whether the display by a tug-boat of two lights, substantially vertical, hung abaft the pilot-house and not at the bow, is a compliance with rule 4 of the navigation rules (Rev. St. § 4233) quaere.

3. The decision in the case of The Blanche Page [Case No. 1,522] questioned.

In admiralty.

Butler, Stillman & Hubbard, for libellant.

S. B. Caldwell and C. Van Santvoord, for claimant of steamboat.

James McKeen, for claimant of tug.

BENEDICT, District Judge. This action is instituted by the owners of the barge Republic, to recover the damages caused by the

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

sinking of that barge in a collision that occurred on the morning of July 13th, 1877, just above Limestone Point, in the Hudson river. The barge was bound up the river, and was being towed astern of the tug Atlas. The City of Troy was bound down the river.

The questions in the case are, whether the collision arose from the omission of the barge to exhibit a light, or from the omission of the tug to display lights indicating that she had a tow, or from failure on the part of the Troy to maintain a proper lookout, or from an attempt on the part of the Troy to pass to west of the tow when she should have passed to east.

The testimony shows that the Troy, having seen the Atlas and being near to her, stopped her engine and hove her wheel aport, with the intention of passing down to west. This sheer carried the Troy clear of the Atlas to the west, and there is no room to doubt that, if the sheer had been maintained, it would also have carried the Troy clear of the barge which the Atlas had in tow. But .the sheer was not maintained; after a sheer sufficient to clear the Atlas had been obtained, the wheel was allowed to run and the engine was permitted to remain still until the two steamboats were fairly abreast of each other. When so abreast of the Atlas, a signal was given on the Troy to start the engine again, which was countermanded before the engine had fairly begun to move, and the collision immediately followed, the Troy striking the port bow of the barge in tow of the Atlas. The blow was given nearly head on, and at that time the Atlas and the barge were bearing to east under a port helm.

The course of action pursued by those in charge of the Troy, after the engine was stopped and the boat given a sheer to west, was the immediate cause of the collision that ensued. The manner in which the two boats came together and the position of the respective vessels conclusively show that, if the Troy's engine had been put in motion as soon as the sheer had been given to the Troy, and if the wheel had been kept aport, the Troy would have cleared the barge, as she did the Atlas. It is equally certain that there was nothing to prevent the Troy from keeping her sheer and from starting her engines as soon as she had got headed to west of the course of the Atlas. Under the circumstances it was imperative on the Troy, if collision was to be avoided, to get further to the west as soon as she could. This course was plainly demanded by the position of the respective vessels, and I cannot doubt that it would have been pursued had the pilot of the Troy known of the presence of the barge in tow of the Atlas. Instead of pursuing this course, the pilot of the Troy allowed the speed of his vessel to diminish and broke his sheer, with the intention of passing as close as possible under the stern of

the Atlas. This he did upon the assumption that there was nothing in tow of the Atlas.

The decisive question of the case, then, as I view it, is whether the pilot of the Troy was justified by the circumstances in assuming at that time that there was no tow astern of the Atlas. He claims to be justified in so assuming, by the fact that it was dark, and the Atlas failed to display the lights required by law to give notice that she had a tow. This justification consists of two elements: darkness such as to render signal lights necessary to show that a boat was in tow of the Atlas, and absence of such lights. If either element be wanting, the justification is not made out. It is clear, upon the evidence, that there was no darkness sufficient to prevent the barge in tow of the Atlas from being seen by those in charge of the Troy at the time when the wheel was let run and even when the boat was slowed. Disinterested witnesses, called by the Troy, prove that the night was not so dark but that, shortly before the collision, the hull of the barge in tow of the Atlas had been seen at a distance much greater than was required to enable the Troy to avoid the barge. The collision occurred on a clear July morning, when the dawn was already breaking, and the weight of evidence is, that the barge was carrying a light at her bow that could have been seen at a considerable distance. Nevertheless, the barge, although plainly visible, was not seen by those on the Troy, and the reason why is disclosed by the evidence. The lookout of the Troy, instead of attending to his duty, had betaken himself to the pilot-house, and with the pilot was engaged in heaving the wheel hard over in the effort to clear the Atlas. The attention of both the pilot and the lookout was engrossed in endeavoring to clear the Atlas, whose presence, moreover, the evidence gives room to contend, had suddenly become known to them. Beyond all question, if the lookout had been at his station, and diligently observing what was ahead of him, he would have warned the pilot, and the barge in tow of the Atlas would have been avoided, for the sheer that carried the Troy to west of the Atlas, if maintained, would certainly have carried her to west of a vessel that was following the Atlas at the length of a hawser. I am, therefore, forced to the conclusion, that the collision in question was caused by the fault of the Troy in not maintaining a proper lookout.

Having arrived at this conclusion, it is unnecessary to determine whether the lights proved to have been carried by the Atlas were such as are required by law to indicate the presence of a tow. There is abundant proof that the Atlas did display two lights substantially vertical, that could be seen at a distance, and it would seem hardly possible that any pilot, seeing those lights, would have failed to infer that he was meeting a tow; but this pilot did not so infer, indeed he says he saw but one of the high lights on the Atlas. The point is therefore made, that the statute requires the high lights to be hung at the stem of the boat, and inasmuch as on the Atlas they were hung abaft the pilot-house—twenty-two feet abaft the stem—they were not such lights as will in law charge the pilot with notice that the Atlas had a tow.

If it were not that a contrary opinion had been expressed by Judge Blatchford (The Blanche Page [Case No. 1,522]), I should have thought that rule 4 of the navigation rules, which by its terms certainly only requires two high lights, carried vertically, without saying whether forward or aft, as the signal for a tow, was complied with by displaying two high vertical lights aft. Such I had supposed was the general understanding of that rule, it having been considered that rule 7, which contains the requirement in respect to those important lights, the range lights, and which directs that an after range light shall be carried at least fifteen feet above the light at the bow, indicates that the vertical lights required by rule 4 are not to be at the bow, because it would be impracticable to carry an after range light fifteen feet higher than lights carried at mast-head on the bow. I may add that I recollect two cases—The Atlas [Case No. 634]; The Tillie [Id. 14,049]—which have proceeded, not only in this court, but in the appellate court, upon the assumption that high vertical lights aft are proper lights to indicate a towing vessel. In both these cases the question of lights was raised, and in both cases the vertical lights were hung aft. The opinion delivered in these cases by the circuit court could hardly have failed to notice the fact if lights so hung had been considered as improperly located. Indeed, in the former case, where the tug engaged in towing carried two high lights aft on the flag-staff, and also two lights on her bow (not mast-head), the opinion declares that "she had her own proper lights set and burning and bright."

But as I look at this case it is unnecessary to decide whether the Atlas complied with the statute in regard to vertical lights, for the reason that, whether she was so equipped or not, there was no difficulty in those on the Troy seeing the barge behind her at the time when they committed the mistake that brought them in collision with the barge, nor to determine whether the failure of the pilot of the Troy to see but one of the two high lights displayed by the Atlas can be supposed to have arisen from the circumstance that the two lights were placed twenty-two feet abaft the stem instead of at the stem. It is equally unnecessary in this view of the case to determine whether, as has been contended, it was a fault of the Troy that she kept a course so nearly approaching the course of the Atlas, and brought herself so close to the Atlas before she changed, instead of passing to east at a safe distance. If the Troy was faulty in this regard that was not the fault

which caused the collision. As already shown, the fault that caused the collision was committed after the Troy began to sheer to the west, and consisted in not seeing the barge when she might have been seen, and in not sheering sufficiently far to the west to avoid her.

No fault contributing to the accident appears in either the Atlas or the barge. The Atlas did not stop or break her sheer but passed as far and as rapidly to east as it was possible to do after receiving the Troy's signal. The barge behind her had a light displayed and she too was as far to east as it was possible for her to get under the circumstances.

According to these views the Troy alone must be held responsible for the collision.

There must therefore be a decree directing that the libellant recover of the City of Troy the amount of damages sustained by the libellant, and that, as against the Atlas, the libel be dismissed with costs.